UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                   Case No. 22-CR-26

ROY HENTON, a/k/a "Pops,"

        Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Gregory J. Haanstad, United States Attorney for the Eastern District of Wisconsin, and Elizabeth M. Monfils and Erica J. Lounsberry, Assistant United States Attorneys, and the defendant, Roy Henton, individually and by attorney Matt J. Ricci, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.      The defendant has been charged in an information, which alleges a violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and 846, and Title 18, United States Code, Sections 1956(h), 924(c)(1)(A)(i), 1347, and 2(a). The defendant was also charged in 15 counts of a 33-count second superseding indictment, which alleges violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), 841(b)(1)(D), and 846, and Title 18, United States Code, Sections 1956(h),

924(c)(1)(A)(i), 1347, and 2(a), and Title 42, United States Code, Section 1320a-7b(b)(2)(A).

3.　　The defendant has read and fully understands the charges contained in the information. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.　　The defendant voluntarily agrees to waive prosecution by indictment in open court.

5.　　The defendant voluntarily agrees to plead guilty to the information set forth in full in Attachment A.

6.　　The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in Attachment A. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment B beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in these offenses.

## PENALTIES

7.　　The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment and fine:

2

Count One: 40 years and $5,000,000. The count also carries a mandatory minimum of 5 years' imprisonment. The count also carries at least 4 years of supervised release, and a maximum of a lifetime term of supervised release.

Count Two: 20 years and $500,000. The count also carries up to three years supervised release.

Count Three: a mandatory minimum of 5 years, and up to life imprisonment, which must run consecutive to any other sentence; a fine of up to $250,000; and up to 5 years of supervised release.

Count Four: 20 years and $250,000. The count also carries up to three years of supervised release.

Each count also carries a mandatory special assessment of $100. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 36 of this agreement.

8.      The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney, including any possibility that the defendant may qualify as a career offender under the sentencing guidelines.

## DISMISSAL OF INDICTMENT

9.      The government agrees to move to dismiss the second superseding indictment as to this defendant at the time of sentencing.

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

10.      The parties understand and agree that for the penalties in 21 U.S.C. § 841(b)(1)(B) to apply, as provided in paragraph 6 above, the government must prove beyond a reasonable doubt that the offense to which the defendant is pleading guilty

3

involved at least 40 grams of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled substance; 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance; 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance; 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; and 100 kilograms of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance. The defendant agrees that the government possesses sufficient, admissible evidence to meet this burden.

## ELEMENTS

11.     The parties understand and agree that in order to sustain the charge of conspiracy to possess with the intent to distribute and distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, as set forth in the information, the government must prove each of the following propositions beyond a reasonable doubt:

> First, the conspiracy, as alleged in the information, existed, and;
> Second, the defendant knowingly and intentionally joined the conspiracy with the intention to further the conspiracy.

12.     The parties understand and agree that in order to sustain the charge of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), as set forth in the information, the government must prove each of the following propositions beyond a reasonable doubt:

> First, an unlawful agreement to violate Section 1956 existed;

4

<u>Second</u>, two or more participants were involved;

<u>Third</u>, the defendant joined the conspiracy; and

<u>Fourth</u>, the defendant intended for the conspiracy to succeed.

13.     The parties understand and agree that in order to sustain the charge of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), as set forth in the information, the government must prove each of the following propositions beyond a reasonable doubt:

<u>First</u>, the defendant committed a drug trafficking crime; and

<u>Second</u>, the defendant knowingly possessed a firearm in furtherance thereof.

14.     The parties understand and agree that in order to sustain the charge of healthcare fraud, in violation of 21 U.S.C. § 1347, as set forth in the information, the government must prove each of the following propositions beyond a reasonable doubt:

<u>First</u>, there was a scheme to defraud a health care benefit program, as charged in the indictment;

<u>Second,</u> the defendant knowingly and willfully carried out or attempted to carry out the scheme;

<u>Third,</u> the defendant acted with the intent to defraud the health care benefit program;

<u>Fourth</u>, the scheme involved a materially false or fraudulent pretense, representation, or promise; and

<u>Fifth,</u> the scheme was in connection with the delivery of or payment for health care benefits, health care items, and health care services.

## <u>SENTENCING PROVISIONS</u>

15.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

5

16.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

17.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

18.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

19.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate

6

information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

<strong><u>Relevant Conduct</u></strong>

20. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

21. The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is at least 1.3 kilograms of fentanyl, a Schedule II controlled substance; 5 kilograms of cocaine, a Schedule II controlled substance; 450 grams of methamphetamine, a Schedule II controlled substance; 25 grams of heroin, a Schedule I controlled substance; and 15 pounds of marijuana, a Schedule I controlled substance.

<strong><u>Base Offense Level</u></strong>

22. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One is 32 under Sentencing Guidelines Manual §2D1.1(c)(4). The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count Two is 32 under Sentencing Guidelines Manual §2S1.1(a)(1). The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count Four is 6 under Sentencing Guidelines Manual § 2B1.1(a)(2).

7

## Specific Offense Characteristics

23.     The parties agree to recommend to the sentencing court that a 2-level increase under Sentencing Guidelines Manual § 2S1.1(b)(2)(B) is applicable to the offense level for the offense charged in Count Two because the defendant was convicted under 18 U.S.C. § 1956.

24.     The parties agree to recommend to the sentencing court that a 16-level increase for a loss amount of more than $1,500,00 under Sentencing Guidelines Manual § 2B1.1(b)(1)(I) is applicable to the offense level for the offense charged in Count Four.

25.     The parties agree to recommend to the sentencing court that a 2-level increase for more than $1,000,000 loss to a government program under Sentencing Guidelines Manual § 2B1.1(b)(7)(B) is applicable to the offense level for the offense charged in Count Four.

## Acceptance of Responsibility

26.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

27. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offenses as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

28. Both parties reserve the right to make any recommendation regarding the length of supervised release and the terms and conditions of the release; the defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

29. The government agrees to recommend a sentence of 10 years of imprisonment.

## Court's Determinations at Sentencing

30. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

9

31. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

32. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

33. The defendant agrees to provide to the Financial Litigation Program (FLP) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLP during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLP and any documentation required by the form.

### Fine

34. The parties agree to recommend that no fine be imposed.

### Special Assessment

10

35.     The defendant agrees to pay the special assessment in the amount of $400 prior to or at the time of sentencing.

## Restitution

36.     The defendant agrees to pay restitution in the amount of $1,702,747.36, jointly and severally, to the below address:

> Wisconsin Department of Justice
> Medicaid Fraud and Control Unit
> Attn: Ann Zenor
> 17 W. Main Street
> Madison, WI 53703

The defendant understands that because restitution for the healthcare offense is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## Forfeiture

37.     The defendant agrees that all properties listed in the information, constitute the proceeds of the offenses to which he is pleading guilty, or were used to facilitate such offenses. The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in each of the listed properties. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

11

## DEFENDANT'S WAIVER OF RIGHTS

38.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a.     If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

    d.     At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

    e.     At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

12

39.     The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offenses to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

40.     The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

41.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

42.     Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his conviction or sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C.

13

§ 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statutes or Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the conduct to which the defendant has admitted does not fall within the scope of the statutes or Sentencing Guidelines. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

### Further Civil or Administrative Action

43. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

44.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

45.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

46.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

47.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offenses on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

48.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final

15

resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

49.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 5/28/25

X Roy Henton
ROY HENTON
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 5/28/23

Matt Ricci
MATT J. RICCI
Attorney for Defendant

For the United States of America:

Date: 5/28/25

GREGORY J. HAANSTAD — Richard G. Frohling
for Acting United States Attorney

Date: 5/28/2025

Elizabeth Monfils
ELIZABETH M. MONFILS
Assistant United States Attorney

17

ATTACHMENT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v.  Case No. 22-CR-26

ROY HENTON, a/k/a "Pops,"

Defendant.

---

## INFORMATION

---

## COUNT ONE

**THE UNITED STATES ATTORNEY CHARGES THAT:**

1.      Beginning by at least June 2020, and continuing until on or about November 29, 2022, in the State and Eastern District of Wisconsin and elsewhere,

**ROY HENTON, a/k/a "Pops,"**

knowingly and intentionally conspired with other persons known and unknown to the grand jury, to possess with the intent to distribute and to distribute a mixture and substance containing a detectable amount of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

2.      The amount involved in the conspiracy attributable to ROY HENTON, as a result of his own conduct, and the conduct of other co-conspirators reasonably foreseeable to him, is 40 grams or more of a mixture and substance containing a detectable

amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as

fentanyl, a Schedule II controlled substance; 50 grams or more of a mixture and substance

containing a detectable amount of methamphetamine, a Schedule II controlled substance;

100 grams or more of a mixture and substance containing a detectable amount of heroin,

a Schedule I controlled substance; 500 grams or more of a mixture and substance

containing a detectable amount of cocaine, a Schedule II controlled substance; and 100

kilograms of a mixture and substance containing a detectable amount of marijuana, a

Schedule I controlled substance.

All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B), and

Title 18, United States Code, Section 2(a).

## COUNT TWO

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

From in or about June 2020 through on or around November 29, 2022, in the State and Eastern District of Wisconsin and elsewhere,

### ROY HENTON, a/k/a "Pops,"

knowingly combined, conspired, and agreed with each other and with other persons known and unknown to the grand jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, namely, to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, drug trafficking as charged in Count One, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

In violation of Title 18, United States Code, Section 1956(h).

Case 2:22-cr-00026-PP   Filed 05/28/25   Page 3 of 15   Document 514

## COUNT THREE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

On or about November 29, 2022, in the State and Eastern District of Wisconsin,

### ROY HENTON

knowingly possessed at least one firearm in furtherance of the drug trafficking offense

charged in Count One of this Information.

In violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

4

Case 2:22-cr-00026-PP    Filed 05/28/25    Page 22 of 50    Document 515
Case 2:22-cr-00026-PP    Filed 05/28/25    Page 4 of 13    Document 514

## COUNT FOUR

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.      At all times material to this indictment:

a.      Defendant ROY HENTON owned and operated A Touch of Love Supportive Care Agency (ATOL).

b.      Defendant PHILLIP DANIELS operated First Response Supportive Care (FRSC) and assisted in operations of ATOL.

c.      Defendant LENARD MONROE owned and operated Wellness Personal Care Service (WPCS).

d.      ATOL and FRSC were Supportive Home Care (SHC) agencies that billed for services purportedly provided to adults with disabilities and elderly people in Milwaukee, Wisconsin.

e.      WPCS was a Personal Care Agency (PCA) that billed Wisconsin Medicaid for services purportedly provided to adults with disabilities and elderly people in Milwaukee, Wisconsin.

### The Wisconsin Medicaid Program

f.      Medicaid was a program jointly funded by the federal government and participating states to provide health insurance to indigent families with dependent children and to aged, blind, and disabled individuals whose income and resources are insufficient to meet the cost of medical services.  42 U.S.C. §§ 1396, et seq. (the "Medicaid Act").

5

g.     Wisconsin participates in the Medicaid program ("Wisconsin Medicaid"). In Wisconsin, the Medicaid program was established pursuant to Wisconsin Statutes Chapter 49 and its administrative regulations. The United States pays for a portion of the program. The Wisconsin Department of Health Services (DHS) administers the Wisconsin Medicaid program on behalf of the state and federal government.

h.     DHS operates a Personal Care Agency (PCA) program through Medicaid. A PCA is a home health agency, county department, independent living center, American Indian tribe or band, or a freestanding PCA that provides services that are (1) medically-oriented activities related to assisting an individual with activities of daily living necessary to maintain the individual in his or her place of residence in the community; (2) provided upon written orders of a physician by a certified personal care provider; and (3) provided by a personal care worker (PCW), employed by the provider and under contract to the provider, who is supervised by a registered nurse according to a written plan of care.

i.     A PCA can submit claims to Wisconsin Medicaid for payment via the ForwardHealth Portal ("the portal") using direct data entry (DDE). The PCA requests secure access to the portal and, using the login associated with their provider IDs, completes required fields in the portal, including member ID, date of service, procedure code, number of units, charge amount, and place of service. The PCA may only submit claims after the services have been provided, and the PCA is responsible for the accuracy of the claims submitted via the portal. Medicaid remits payments to the PCA based on the approved claims.

6

j.      To participate in the Medicaid program, a PCA provider must enter into a written Medicaid Provider Agreement (the "Provider Agreement") with the Wisconsin Department of Health Services in which the provider certifies that every claim submitted is truthful and that the services billed have been furnished in accordance with state and federal law. The Provider Agreement also requires a certification that the provider has not offered, paid, or received anything of value in return for the referral or provision of Medicaid-covered services.

k.      The IRIS program (Include, Respect, I Self-Direct) is a Medicaid Home and Community-Based Services (HCBS) waiver program authorized under § 1915(c) of the Social Security Act and approved by the Centers for Medicare and Medicaid Services (CMS). IRIS is a self-directed program for adults with disabilities and elderly people in Wisconsin. To be eligible for the IRIS program, one must be eligible for Medicaid, need the same level of care as someone in a nursing home, and live in a home, apartment, adult family home, or residential care apartment complex. IRIS participants receive a budget for a range of goods, support, and services, including SHC.

l.      A SHC agency must have a valid Medicaid provider's agreement to provide SHC services under the umbrella of the IRIS program and must employ direct-care workers.

m.      A SHC agency submits SHC claims directly to the participant's Fiscal Employer Agency (FEA) monthly using an IRIS provider invoice, which includes the SHC agency information, the participant's information, dates of service, service codes, units, unit rate, unit type, and the total dollar amount. The FEA adjudicates claims based

7

on the participant's approved authorization. If the claims are authorized, the FEA will submit the claims to DHS for funding. DHS will then fund a zero-balance state-held bank account. The SHC agency then receives reimbursement for the claim through an electronic funds transfer.

n.     To participate in the home and community-based waiver services under Wisconsin's Medicaid program, a SHC agency must enter into a written Wisconsin Medicaid Program Provider Agreement with the Wisconsin Department of Health Services in which the provider agrees to comply with all applicable federal and state laws, regulations, and policies relating to providing home and community-based waiver services under Wisconsin's Medicaid program and to provide only the items or services authorized by the managed care organization or IRIS program.

<u>The Scheme</u>

2.     Beginning by at least August 25, 2018, and continuing through November 29, 2022, in the State and Eastern District of Wisconsin and elsewhere,

**ROY HENTON, a/k/a "Pops,"**

knowingly and willfully executed and attempted to execute a scheme to defraud a health care benefit program, namely Wisconsin Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of such program, in connection with the delivery of and payment for health care benefits, items, and services.

3.     DANIELS, HENTON, MASSEY, and MONROE executed the scheme in the following ways:

8

a. DANIELS and HENTON advertised and provided housing to individuals who qualified for Medicaid services. In some instances, MONROE referred individuals to DANIELS and HENTON for housing services.

b. DANIELS and HENTON controlled various rental units in Milwaukee, Wisconsin.

c. DANIELS and HENTON offered discounted rent and paid stipends to individuals who were signed up for supportive care service with their entities, ATOL and FRSC.

d. DANIELS and HENTON recruited individuals who MONROE billed for Medicaid-covered services through WPCS. MONROE paid FRSC for these referrals and to maintain the individuals as members and participants of WPCS and ATOL.

e. DANIELS and HENTON coached Medicaid members to feign limitations in their activities of daily living to increase the hours that could be billed to Medicaid.

f. MASSEY purported to serve as a PCW for WPCS. MASSEY, MONROE, DANIELS, and HENTON also used stock, template timesheets to memorialize the purported care being provided. As a result, MASSEY, MONROE, DANIELS, and HENTON knowingly submitted and caused to be submitted timesheets that misstated the duration, frequency, date, and nature of the services provided, as well as the number of miles claimed.

9

g.      DANIELS, HENTON, MASSEY, and other individuals they directed and controlled, knowingly submitted and caused to be submitted Provider Claim Forms that misstated the date, frequency, and duration of services provided.

h.      DANIELS, HENTON, MASSEY, and MONROE, and other individuals they directed and controlled, submitted claims for payment to Medicaid based on those false and fraudulent statements.

4.      DANIELS and HENTON submitted and caused to be submitted bills totaling over $600,000, which contained false and fraudulent statements, and which caused Wisconsin Medicaid to pay them over $574,000 to which they were not entitled.

5.      DANIELS and HENTON used bank accounts in the names of FRSC and ATOL to receive cash deposits in addition to the above-noted Medicaid payments. More specifically, between January 2018 and May 2022, accounts in the name of FRSC and ATOL received over $1.3 million in unexplained cash deposits. During this same time period, bank accounts in the names of FRSC and ATOL reflected over $2.7 million in cash withdrawals.

6.      Bank accounts in the names of FRSC were further used to receive drug proceeds through transactions conducted by DANIELS, MASSEY, and other members of the drug trafficking organization, and to transfer monies contained therein to known suppliers of controlled substances, thereby advancing the goals of the drug trafficking organization.

10

Case 2:22-cr-00026-PP    Filed 05/28/25    Page 28 of 50    Document 515
Case 2:22-cr-00026-PP    Filed 05/28/25    Page 10 of 13    Document 514

7.     MONROE submitted and caused to be submitted bills totaling over $1.3 million, which contained false and fraudulent statements, and which caused Wisconsin Medicaid to pay him over $1.1 million to which he was not entitled.

8.     On or about the dates set forth below, in the State and Eastern District of Wisconsin and elsewhere,

**ROY HENTON, a/k/a "Pops,"**

for the purpose of executing the scheme described above, and in connection with the delivery of and payment for health care benefits, items, and services, knowingly and willfully submitted and caused the submission of the following false and fraudulent claim on the dates below, which falsely represent the nature of the provider's interaction with the member indicated below, falsely represented that covered services were provided, and falsely represented the amount of time spent providing covered services, which caused payments in the following amounts:

| Count | Service Date | Billed Date | Member | Amount Billed | Amount Paid |
|-------|--------------|-------------|--------|---------------|-------------|
| 25    | 5/23/2021    | 6/10/2021   | U.A.   | $80           | $80         |

In violation of Title 18, United States Code, Sections 1347 and 2(a).

**FORFEITURE NOTICE**

1.     Upon conviction of one or more offenses in violation of Title 21, United States Code, Sections 841 and 846, the defendant shall forfeit to the United States pursuant to Title 21, United States Code, Section 853, any and all property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the violations and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the violations, including but not limited to the following:

   a.    approximately $885.21 in United States currency seized from Chase Bank Account ending in x8205, in the name of Intelligent Investments;

   b.    approximately $184.67 in United States currency seized from Educators Credit Union Account ending in x13_08, in the name of A Touch of Love Supportive Care Agency/The Perfect Choice Supportive Care Agency;

   c.    approximately $5.00 in United States currency seized from Educators Credit Union Account ending in x13_00, in the name of A Touch of Love Supportive Care Agency/The Perfect Choice Supportive Care Agency; and

   d.    a money judgment in the amount of proceeds the defendants obtained, directly or indirectly, as a result of the offense or offenses of conviction.

2.     Upon conviction of the health care fraud offense, in violation of Title 18, United States Code, Section 1347, or the money laundering offense, in violation of Title 18, United States Code, Section 1956(h), the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1) and 982(a)(7), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of said violations, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the offenses,

12

3.      If any of the property described above, as a result of any act or omission by a defendant cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

Date: 5/28/25

_for_ RICHARD G. FROHLING
Acting United States Attorney

13

Case 2:22-cr-00026-PP    Filed 05/28/25    Page 31 of 50    Document 515
Case 2:22-cr-00026-PP    Filed 05/28/25    Page 13 of 13    Document 514

## ATTACHMENT B

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. These facts are based upon court-authorized Title III interceptions, information provided by law enforcement agents, surveillance, controlled purchases of controlled substances, physical evidence seized, confidential sources, financial records, and other evidence. This information is provided for the purpose of setting forth a factual basis for the defendant's guilty plea. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## BACKGROUND REGARDING THE DANIELS DTO

In January 2022, members of the North Central High Intensity Drug Trafficking Area (HIDTA), the Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), and the Internal Revenue Service (IRS) initiated an investigation into individuals distributing large quantities of methamphetamine, heroin, fentanyl, cocaine, and marijuana throughout Milwaukee, Wisconsin, and elsewhere. Law enforcement officers identified the leader of the drug trafficking organization (DTO) as Phillip DANIELS SR., a/k/a "Dr. Phil", who established distribution locations in Milwaukee, Wisconsin; St. Paul/Minneapolis, Minnesota; and Chicago, Illinois.

The investigation resulted in courts authorizing the monitoring of several cellular telephones used by DTO members, including the phones of Roy HENTON, DANIELS, and Jameel BRADLEY, SR.

Interceptions and other evidence revealed that, beginning by at least October 2021, Joathan COLULA and Jimmy GONZALEZ-MACIAS, California residents, supplied the DANIELS DTO with methamphetamine, cocaine, and fentanyl. Julio BARRAZA, another California resident, packaged and mailed the controlled substances to the DANIELS DTO using fictitious names. Deonte EDWARDS, also a resident of California, assisted DANIELS in purchasing controlled substances from the California-based sources of supply, used his business account to facilitate the payment of drug proceeds to the DTO's suppliers, and obtained, packaged, and sent controlled substances, including fentanyl, cocaine, and marijuana, to the DANIELS' DTO.

DANIELS was based in Milwaukee, where he operated at least one stash location at 52XX N. Teutonia Avenue. HENTON, also based in Milwaukee, was DANIELS' partner in DTO operations, and he manufactured and distributed controlled substances, frequented the Milwaukee DTO stash location, and retrieved parcels suspected to contain controlled substances. Kevin NELSON and Domonique LEWIS were Milwaukee-based DTO distributors. MASSEY, DANIELS' long-term girlfriend based in Milwaukee,

received narcotics-laden parcels, distributed controlled substances, and laundered and facilitated the movement of DTO proceeds. Airline records show that DANIELS, HENTON, and MASSEY all traveled from Milwaukee or Chicago to California on multiple occasions. Intercepted communications and surveillance reveal that these trips were to procure controlled substances for the DTO.

The DTO distributed methamphetamine, fentanyl, heroin, cocaine and other controlled substances in Minnesota. DANIELS and Michael WILLIAMS worked in partnership to manufacture and distribute controlled substances in the St. Paul/Minneapolis metropolitan area. WILLIAMS and DANIELS operated a stash location in Minneapolis. Ramona FRYER was a Minnesota-based DTO distributor who received narcotics-laden parcels, maintained a storage locker used to store drugs, frequented the Minnesota stash house, and laundered and facilitated the movement of DTO proceeds. Carla SMITH, FRYER's mother, was also a Minnesota-based DTO distributor.

Furthermore, the DTO distributed controlled substances in the greater Chicago, Illinois area. DANIELS and JAMEEL BRADLEY SR. worked in partnership to procure controlled substances, to include methamphetamine and cocaine, for the DTO. BRADLEY SR. traveled with DANIELS to California and Memphis, Tennessee to facilitate and supply narcotics to the DTO. Itzel CRUZ-GONZALEZ also worked with BRADLEY SR. and DANIELS to procure controlled substances, including methamphetamine, from GONZALEZ-MACIAS. CRUZ-GONZALEZ also facilitated the DTO by packaging controlled substances, to include cocaine, and by accounting for DTO proceeds. DANIELS and BRADLEY SR. then worked together to distribute controlled substances in and around Chicago.

To date, court-authorized interceptions, physical and electronic surveillance, and postal records reflect that the DANIELS DTO used United Postal Service (UPS), FedEx, and/or the United States Postal Service (USPS) to ship and receive at least 45 parcels containing controlled substances, to include methamphetamine, fentanyl, cocaine, and marijuana. COLULA, BARRAZA, and EDWARDS sent the drug parcels to DTO-related addresses in Milwaukee, Wisconsin, and St. Paul, Minnesota, using aliases and/or fictious identifying information. During the course of the investigation, two narcotics-laden parcels were lawfully searched, resulting in the seizure of approximately 3 kilograms of cocaine from a package addressed and mailed to FRYER at her home address by BARRAZA in March 2022, and 1 kilogram of fentanyl from a package sent to DANIELS in Milwaukee in November 2022.

Throughout the course of the investigation, DTO members, including HENTON, used various business bank accounts to conceal and disguise the nature and source of their drug proceeds. DANIELS, HENTON, MASSEY, FRYER, and BRADLEY SR. deposited drug proceeds in the form of cash and cashiers' checks into (1) DANIELS' and

2

Betty DANIELS' (B. DANIELS) business account, (2) COLULA's business account, and (3) EDWARDS' business account. DANIELS withdrew currency in the form of cashier's checks from his business accounts, which he then electronically transferred to EDWARDS' business account in the name of Tier One Records, which EDWARDS used as a "funnel" account. After receiving the drug proceeds, EDWARDS withdrew the money and gave it to the DTO's California-based suppliers, to include COLULA and GONZALEZ-MACIAS.

The investigation further revealed that DANIELS used various other methods to send drug proceeds to the California-based suppliers. DANIELS used "ghost" bags by sending luggage, believed to contain drug proceeds, to Los Angeles, California, on flights that he did not board. On one occasion, COLULA was observed picking up a "ghost" bag. On another occasion, a "ghost" bag was lawfully searched, revealing $105,000 in bulk currency. The DTO also used couriers to drive the controlled substances from California to the Midwest at DANIELS' the direction. In January 2022, law enforcement seized approximately 7 kilograms of cocaine from a DTO courier while the courier was traveling from California to Milwaukee at the direction of DANIELS and BRADLEY SR.

On November 29, 2022, case agents executed numerous federal arrest warrants for DTO members and search warrants at DTO-associated locations. The search warrants resulted in the seizure of over 10 kilograms of fentanyl (pressed fentanyl and fentanyl in pill form), approximately 7 ½ kilograms of cocaine, more than one kilogram of methamphetamine (crystal methamphetamine and methamphetamine pills), nearly 2 kilograms of heroin, ecstasy, oxycodone, approximately 170 pounds of marijuana, marijuana edibles, over $450,000, and 19 firearms.

## HENTON'S DTO INVOLVEMENT

HENTON assisted DANIELS in the day-to-day activities of the DTO. He distributed and arranged for the distribution of controlled substances, including heroin, fentanyl, methamphetamine, and cocaine; assisted in manufacturing or "cooking" controlled substances; collected DTO proceeds; and retrieved parcels containing controlled substances. HENTON also assisted DANIELS in making upper-level decisions regarding the DANIELS DTO and traveled to California and Minnesota to further DTO activities.

HENTON frequently used his phone to further DTO activities. As discussed above, case agents applied for and received authorization for pen registers and wiretaps monitoring of several cellular telephones used by DTO members, including HENTON. Between August 24, 2022, and October 27, 2022, case agents intercepted approximately 293 calls and/or text messages between HENTON and others regarding the DTO's business.

3

Case agents also conducted physical and electronic surveillance and observed HENTON conducting drug trafficking activities alongside DANIELS on multiple occasions. Using these investigative methods, and from airline records, they learned that HENTON flew from Milwaukee to Los Angeles, California, where the DTO sourced many of its drugs, on multiple occasions between 2020 and 2022. On these trips, he was accompanied by DANIELS and/or BRADLEY SR. They also saw DANIELS and HENTON visit the DTO's stash house on Teutonia Avenue in Milwaukee on numerous occasions, including during four controlled purchases of narcotics. Additionally, they observed that HENTON often drove rental vehicles. Intercepted communications reflect that HENTON and DANIELS took precautions to avoid being stopped by law enforcement and to avoid being found in possession of contraband if they were to be stopped by officers.

The following are examples of DTO activities in which HENTON participated, and about which case agents learned from a combination of physical and electronic surveillance, controlled buys, search warrants, and other investigative activity:

During this course of this investigation, a Confidential Source hereinafter referred to as CS 3, at the direction and under the control of case agents, purchased controlled substances from HENTON and DANIELS. On July 14, 2022, CS 3 purchased approximately 7 grams of cocaine from DANIELS and HENTON in exchange for $460.

The following day, July 15, 2022, at approximately 11:35 p.m., DANIELS and HENTON visited CS 3 unexpectedly to provide "samples" of various controlled substances. DANIELS gave CS 3 three small corner cut baggies. The first bag contained five round blue pills with the inscription "M 30," which DANIELS referred to as "blue cheese." The second contained a clear shard, which DANIELS referred to as "sunglasses." The third contained a gray/purple rock-like substance, which DANIELS referred to as "Barney." DANIELS then produced a sandwich bag that contained a brown powdery substance, which DANIELS referred to as "H-Town." CS 3 reported that DANIELS possessed a golf-ball size quantity of the brown powdery substance, from which DANIELS broke off a smaller quantity, which he placed in a corner cut bag for CS 3. DANIELS instructed CS 3 how much CS 3 could profit from the different types of narcotics if CS 3 were to find buyers for them, and he wrote down the prices of each of the drugs for CS 3 as shown below:

4

"Blue Cheese" referred to counterfeit Oxycodone Hydrochloride pills, "H-Town" referred to heroin, "Barney" referred to fentanyl, "Sunglasses" referred to methamphetamine, and "White Bitch" referred to cocaine. Field testing reflected that the samples DANIELS and HENTON provided CS 3 were approximately 2.97 grams of a substance containing heroin and fentanyl, approximately 1.14 grams of methamphetamine, approximately 2.8 grams of fentanyl, and 0.55 grams of methamphetamine in pill form.

On July 26, 2022, CS 3 purchased cocaine and a heroin/fentanyl mixture from DANIELS and HENTON. CS 3 had several recorded calls with HENTON setting up the transaction. During one of these calls, HENTON told CS 3 that DANIELS had been stopped by law enforcement while on the freeway and that their transaction would be delayed until 3:30 or 4 p.m. as a result. Subsequently, HENTON called DANIELS, who traveled to the stash location on Teutonia Avenue. Once there, DANIELS called HENTON, and immediately thereafter, HENTON called CS 3 and told CS 3 that DANIELS was heading to HENTON's home. HENTON advised that he would bring DANIELS straight to CS 3.

Meanwhile, case agents observed DANIELS bring two bags that appeared to be heavy into the stash house. While inside, DANIELS had a thirty-minute call with HENTON. Afterwards, DANIELS exited the stash house carrying a black duffel bag and wearing blue latex gloves, and he entered his car and drove away.

A short time later, DANIELS and HENTON arrived together to meet CS 3. During their meeting, DANIELS asked CS 3 what he wanted. CS 3 answered, "I called [HENTON] and text him. I said, 'I need a half of the soft and an ounce of the Barney.'" Thereafter, DANIELS quoted CS 3 prices for the soft (cocaine) and Barney (fentanyl). DANIELS then told HENTON that he had been mistaken about what CS 3 wanted, and he asked CS 3 for fifteen minutes to straighten things out.

HENTON and DANIELS then drove together in DANIELS' car to the Teutonia stash location. Both went inside, and they exited about 45 minutes later and reentered

5

DANIELS' car. Both returned to the meeting point with CS 3, and they sold CS 3 13.77 grams of cocaine and 26.4 grams of a mixture of heroin and fentanyl for a total of $2,300.

On August 25, 2022, HENTON spoke to an unidentified male about cooking powder cocaine into crack cocaine. That day, the DTO received a parcel suspected to contain controlled substances. At approximately 12:39 p.m., the unknown male called HENTON, who said, "It's Pops… You want to get together and do some cooking, man?" The male responded, "Uh, I'm finna, I ain't even finna be here today." HENTON then stated, "When you wanna. . . get together and do some cooking?" They then discussed the possibility of getting together that weekend.

On August 31, 2022, CS 3 called HENTON and said, "I need uh, an ounce of that H-Town," referring to heroin. HENTON replied, "Just text it to me" and "I'll get on top of it right, uh, right away." HENTON further stated, "Text me all the—all, all, all the sugar cookies you want." Subsequently, CS 3 purchased 25 grams of heroin in "brick form" from DANIELS and HENTON in exchange for $1,500.

That same day, one of the DTO's Milwaukee-based distributors, Kevin NELSON, complained about the quality of some controlled substances he had previously received from DANIELS. Through physical and electronic surveillance, case agents monitored a subsequent meeting in which DANIELS and HENTON traveled from the Teutonia Avenue stash house to NELSON's residence, then returned to the stash location.

On approximately September 9, 2022, a parcel containing controlled substances was delivered to 10018 W. Fond Du Lac Avenue in Milwaukee, the address next door to where DANIELS resided at the time. The parcel was addressed to "Andre Garner," to disguise that DANIELS was the true recipient, and sent from "Michael Herrera," an alias for DTO supplier BARRAZA, from an address in California. A short time later, case agents conducting physical surveillance observed DANIELS meet the delivery driver, who was carrying a large, square cardboard box, and step out of view for a few moments behind DANIELS' house, after which the delivery driver re-appeared without the box.

A few minutes later DANIELS, called HENTON, who was seated in the front passenger seat of Daniels' car outside the residence. At the time, DANIELS was cutting the drugs from the parcel. HENTON told DANIELS, "I got Mary at the door. I got to run to the bank." DANIELS replied, "What you got to run to the bank for? I mean…" HENTON stated, "I got to see what happened to two thousand dollars was out my account; they won't tell me." DANIELS then stated, "Okay, Pops, but that's not gonna go nowhere right now. Me and you need to finish our business." While on the phone with DANIELS, case agents observed Angel MCLAURIN, HENTON's longterm partner, enter DANIELS' residence. Case agents heard MCLAURIN in the background of the intercepted call tell an unknown child, "Go outside!" and "He's doing something, go!" MCLAURIN later walked over to DANIELS' car and spoke with HENTON, who asked,

"Babe, what did Phil say?" MCLAURIN replied, "I told her [U/I], 'cause Phil was cutting some stuff in the kitchen, and I didn't want her, um…"

On October 3, 2022, at approximately 2:41 p.m., DANIELS called HENTON about a package containing drug that needed to be retrieved from the UPS store in Menomonee Falls. During the conversation, DANIELS asked, "Get a hold of Andre?" As discussed above, DANIELS received parcels containing narcotics addressed to the name "Andre Garner." HENTON replied, "Yeah. What you need?" DANIELS told HENTON that DANIELS needed "Andre" to take care of something for him and asked, "And get . . . you still got his ID card?" The parties discussed the "ID card," and DANIELS later stated, "I brought it to you right there in the . . . I said, 'Pop, this Andre ID card; can you give it back to him?'" HENTON continued to state that he could not locate "Andre's" ID card and could not recall if he gave it back to "Andre." Near the end of the conversation, HENTON asked, "Where you want me to take Andre?" DANIELS replied, "I'm going to send you the address. It's in Menomonee Falls. It's not too far from the house." Later, HENTON asked, "So why do I gotta take. . . What's going on? Why do you want me to take him over there for?" DANIELS then stated, "'Cause I got something that's waiting there."

Case agents then conducted surveillance at the UPS Store on Appleton Avenue in Menomonee Falls. They obtained video of the arrival of HENTON at the UPS store with MCLAURIN and Andre GARNER. Surveillance officers observed GARNER walk into the UPS store but return to the vehicle without any parcel. Meanwhile, a federal warrant was obtained to search this parcel. Inside, case agents found approximately five pounds of marijuana.

As discussed above, between October 7, 2021 and November 11, 2022, at least forty-five parcels known or suspected to contain controlled substances were shipped from California to addresses associated with the DTO. The parcels were traced to the same group of senders—the DTO's suppliers and their associates—and the listed recipients were DTO members or their nominees. One of these addresses was 99XX W. Fond Du Lac Avenue in Milwaukee, an address used by A Touch of Love, a home healthcare agency run by HENTON. A parcel destined for this address was searched on November 11, 2022, pursuant to a warrant and found to contain a kilogram of fentanyl.

Besides these examples of HENTON's direct involvement, DANIELS and other members of the DTO engaged in other sales of narcotics that were reasonably foreseeable to HENTON. For instance, on September 20, 2022, CS 3—with whom HENTON had been involved in three previous controlled buys—purchased 66.47 grams of fentanyl in "brick form" from DANIELS for $3,880. An audio recording of this meeting reflects that during this controlled buy, DANIELS told CS 3, "It's hard to keep around… you follow me?" DANIELS further stated, "That real, authentic fentanyl [U/I]."

On November 29, 2022, case agents searched HENTON's home pursuant to a federal search warrant. Among the contraband they recovered was approximately 61.05 grams of cocaine located in a box on the floor in the basement. MCLAURIN told officers that HENTON had placed the drugs in the box the day before. A search of a storage locker rented by HENTON was also searched this day after a drug detection canine indicated thereon. Inside, case agents found a scale commonly used for narcotics sales.

Also on November 29, 2022, case agents also searched the stash location on Teutonia Avenue pursuant to a federal search warrant and recovered 818 grams of fentanyl, 38.9 grams of fentanyl pills, 39.3 grams of p-Fluorofentanyl, 2,140 grams of cocaine, 31 grams of cocaine base, 85.7 grams of methamphetamine pills, 123 grams of heroin, and 120 grams of Oxycodone, and 6 firearms. HENTON was observed entering the Teutonia Avenue stash location the previous night, on November 28, 2022, with DANIELS and MASSEY.

## SOURCE INFORMATION REGARDING HENTON'S DTO INVOLVEMENT

Source of Information 1 (SOI 1) told law enforcement that SOI 1 has been involved with DANIELS since approximately September 2020. Between that time and January 2021, SOI 1 sold DANIELS and HENTON multiple kilograms of cocaine, heroin, and methamphetamine in the St. Paul/Minneapolis area. According to SOI 1, the drugs were shipped to Minnesota, and a typical shipment contained six kilograms of cocaine, six kilograms of heroin, and thirty pounds of methamphetamine.

SOI 1 stated that in December of 2020, a Minnesota-based DTO member stole four kilograms of cocaine from DANIELS. Immediately thereafter, DANIELS and HENTON flew into Minneapolis to address the theft. At this time, SOI 1 met with DANIELS and HENTON regarding the price for cocaine. During the meeting, HENTON agreed to drop the price of a kilogram of cocaine sold to SOI 1 from $45,000 to $40,000 but advised SOI 1 not to disclose the price to anyone else. This interaction gave SOI 1 the impression that while DANIELS ran the DTO, HENTON had the final say and in its operations.

Source of Information 2 (SOI 2) transported drugs from California to Wisconsin on about four or five occasions at DANIELS and BRADLEY SR.'s direction. When SOI 2 was in Milwaukee, SOI 2 observed HENTON directing other DTO members. SOI 2 gave an example of an occasion when HENTON instructed DANIELS' nephew, Christopher, to go to their "office," meaning their stash house, which he did. When Christopher returned, he had powder cocaine with him, which he then cooked into crack cocaine.

Source of Information 3 (SOI 3) purchased marijuana from HENTON.

Source of Information 6 (SOI 6) knew HENTON to distribute small quantities of cocaine in the Milwaukee area for the DTO. According to SOI 6, when DANIELS was out

of town, HENTON would pick up shipments of kilogram quantities of controlled substances and deliver them to DANIELS when he returned.

Source of Information 8 (SOI 8) described HENTON's partnership with DANIELS in the DTO. HENTON had a key to the stash house on Teutonia Avenue and would assist DANIELS there with mixing and packaging controlled substances for sale. HENTON was most recently inside the stash house on November 28, 2022, the night before his arrest, and he took 100 grams of a controlled substance with him when he left.

SOI 8 stated that HENTON directly sold small amounts of cocaine and M30 fentanyl pills. SOI 8 estimates that DANIELS gave HENTON approximately two kilograms of cocaine to distribute between 2020 and 2022. HENTON also supplied drugs to a mid-level dealer with the initials K.D., with whom HENTON had been romantically involved.

SOI 8 described a trip that HENTON made to California with DANIELS and MASSEY. During the trip, DANIELS bought one kilogram of black tar heroin, four to five kilograms of cocaine, fifteen pounds of marijuana, and two pounds of crystal methamphetamine from a source known to SOI # as "Angel." HENTON, DANIELS and MASSEY then drove these substances back to Milwaukee, and the drugs were later distributed in Milwaukee, Chicago, Illinois, and Indiana.

## HENTON'S POSSESSION OF FIREARMS IN FURTHERANCE OF DRUG TRAFFICKING

From approximately March 2022 until his arrest on November 29, 2022, HENTON lived at 99XX W. Fond du Lac Avenue in Milwaukee. Court-authorized location data on HENTON's phone has shown HENTON in the vicinity of the residence on a regular basis, including the overnight hours during the approximate time period of July 11, 2022 to October 29, 2022, when the authorization for that location monitoring expired. HENTON was observed via digital surveillance at the residence on November 20, 2022, shortly before the warrant for his arrest was obtained. During the course of the investigation, case agents discovered the HENTON kept multiple guns in his home for protection due to the DTO activities he was involved in.

On September 18, 2022, at approximately 10:36 a.m., HENTON called MASSEY looking for DANIELS. During the call, HENTON admitted to owning guns. He brought up a woman whom they discussed had been causing trouble and had pulled a gun out on another woman. HENTON told MASSEY, "Yeah, she pulled a gun on that girl. She grabbed a gun in, which, I keep my guns—now I know she grabbed my gun and pulled it in the girl's face." MASSEY replied, "Out of control. No shame whatsoever." HENTON stated, "Joelle, she coulda shot that girl and I woulda had to explain why she had shot that girl in my house." MASSEY echoed him, "In my house. With your gun." HENTON

9

continued, "With my gun. And that bitch would have start lying right then." MASSEY agreed, "Right there and then, oh yeah. What? You better believe it." MASSEY talked about how the gun could have accidentally gone off and added, "That woman got a loaded gun." HENTON clarified, "But I never have no clips in it, and when I had it sitting out, I had not one clip in it—one bullet in it." MASSEY asked, "There was none in the chamber?" HENTON replied, "Nope; I had nothing. And when she pull it, I didn't tell her. I just wasn't gonna be having it in my house. I thought, 'This bitch is gone, period.'"

That afternoon, MCLAURIN called HENTON and stated, "You forgot your pistol . . . It's on top the 'frigerator." HENTON responded, "Ok." MCLAURIN replied, "Can you swing back?" HENTON then said, "No, it's okay; I'm good." MCLAURIN then asked, "Are you gonna be safe?" HENTON replied, "I'm good, Mia."

On October 20, 2022, at approximately 7:39 p.m., HENTON called his daughter, Tamara. He told her, "Hey, listen, get—get off—get off the house—I don't want anybody to hear." He then instructed her, "Ok, now when you go in my room, take a look—look where the mirror at." HENTON also told her, "There's a key that's gonna open up my closet door. Take my pump and my, uh, my R8 X15, uh, machine gun. Put that—put that stuff in my closet and then lock my door." Tamara said, "Okay." HENTON stated, "Make sure you do that 'cause I don't want nothing to happen." Tamara said, "Right, right. I got you." HENTON explained, "'Cause it's on the wall. Both—both my guns—guns are on the wall, sitting—that's sitting up, uh, by the other [U/I]. But I want you to put them in the closet." HENTON insisted that Tamara take care of this "first thing" and told her he was on his way.

Their conversation continued in another call that evening at approximately 8:07 p.m. Tamara called HENTON back and HENTON asked Tamara, "Did you see the key?" When she confirmed she had it, HENTON told her, "Okay. And then close the door." Tamara answered, "Right." HENTON continued, "And open my closet door, and put those guns—you see them big guns." Tamara answered, "Yes. Yes, daddy." She told HENTON, however, "Well, I'm scared to pick these up. You sure the safety on?" HENTON reassured her, "You're okay. You're okay. They ain't gonna hurt you. People hurt you. They won't—guns won't hurt you. People hurt you." Tamara laughed and stated, "Dang, I've never carried one of these before." HENTON replied, "Yeah, that's some—that's some heavy shit there. That's some stuff we fightin' in wars with."

On November 29, 2022, when case agents searched HENTON's home, they found five firearms, including:

- A Smith and Wesson .38 special revolver that had five unfired cartridges in the cylinder (Serial number DJD8402 638-3), located in a wooden cabinet in the basement;

- A Glock Gen 5 9mm semi-automatic handgun that had an extended magazine inserted into the firearm but did not have a round in the chamber (Serial number BNMX283), located in a holster on the kitchen table along with two other extended magazines;
- A Smith and Wesson M&P AR-15 semi-automatic rifle that did not have a magazine inserted into the firearm but a rifle magazine was found nearby (Serial number TM95970), located in HENTON's bedroom in a closet in the northwest corner of the room;
- A AKKAR Model 612 Churchill 12-gauge shotgun that did not have unfired rounds in the tube (Serial number 20037623), located in HENTON's bedroom in a closet in the northwest corner of the room; and
- A CZ-75 P-07 9mm semi-automatic handgun (Serial number A827536), along with 2 magazines, one loaded with 13 cartridges, located in McLaurin's purse which was in the upper West bedroom.

Law enforcement also located the following in HENTON's bedroom: a 40-round magazine loaded with 34 unspent cartridges, an empty 10-round magazine, a 17-round magazine loaded with 12 unspent cartridges, additional ammunition to include 15 rounds of unspent 12 gauge defense ammunition, HENTON's driver's license, and paperwork for A Touch of Love Supportive Care Agency, LLC / Articles of Organization.

Law enforcement also located 61.05 grams of cocaine base, approximately 350 rounds of ammunition in HENTON's basement, 4 magazines that included one loaded 15-round magazine and an empty 30-round magazine, and a nylon holster containing two .38 special speed loaders with 10 unspent cartridges.

## HEALTHCARE FRAUD

DANIELS and HENTON operated two supportive cares agencies, First Response Supportive Care (FRSC) (registered to Betty DANIELS and controlled by DANIELS), and A Touch of Love (ATOL) (owned and operated by HENTON), that billed Wisconsin Medicaid. HENTON worked closely with DANIELS and MASSEY to submit timesheets to Wisconsin Medicaid to induce payment for services allegedly rendered to their clients. From approximately January 2019 through August 2021, FRSC bank accounts electronically received approximately $250,000 from Wisconsin Medicaid. Additionally, from March 2019 to May 2020, a bank account controlled solely by B. DANIELS received approximately $10,000 from Wisconsin Medicaid. From January 2019 through October 2021, bank accounts controlled by HENTON in the name of ATOL received approximately $959,000 from the State of Wisconsin Medicaid.

11

The evidence gathered during this investigation of this case, however, reflects that the invoices billed to and paid by Wisconsin Medicaid were fraudulent in that services were not rendered to the purported clients in the manner detailed on the timesheets. In many instances, no services were rendered at all. Instead, DANIELS and HENTON, through their agencies, offered to their clients reduced-rate housing at properties they rented in exchange for their clients' Medicaid information, which they used to bill the State of Wisconsin Medicaid for services that were never provided.

In some instances, DANIELS and HENTON gave their clients a cash kickback in the form of a "stipend." These kickbacks were tracked in both handwritten and typewritten ledgers and referred to as "payroll." Clients typically had to sign for their payments. The payments were generally hand-distributed weekly (or, in some instances, bi-weekly or monthly) by so-called personal care workers in envelopes. A few clients, however, received the payments electronically via CashApp.

These activities were reflected in intercepted calls involving HENTON, DANIELS, and others. For example, on September 18, 2022, at 6:52 p.m., HENTON received a call from a client named "Ashley" who said, "Hey, Pops. Uh, question: How much is my rent gonna be this month?" DANIELS then joined the call and replied, "It's 350 each month; that's what it is." Ashley responded, "Oh, so you're not gonna give me a discount?" DANIELS replied, "There's not gonna be a discount. Why—why would you have… Oh, oh, oh, 'cause you—right; I apologize. You on services with us now. I- This is Doctor Phil. Let me, let me go over your file and everything and make sure everything is going well, and I'll call you back with it, okay?" Minutes later, at approximately 6:58 p.m., DANIELS called Ashley back and stated, "Hey, Ashley. One—175, okay? . . . That's the rent now."

Additionally, on September 12, 2022, a representative of Community Family Care called HENTON inquiring about a client who was considering switching services to HENTON's agency. During this call, HENTON told the caller that they sign people up for supportive cares, "give out monthly stipends," and "help people with" housing.

Some of the FRSC and ATOL clients who needed services complained to HENTON, DANIELS, and/or MASSEY that they were not receiving services, however the services still were not rendered. On the other hand, many of DANIELS and HENTON's clients did not qualify medically to receive supportive cares. DANIELS and HENTON coached these clients to feign limitations in activities of daily living in order to make it appear as though they were qualified. In other instances, DANIELS and HENTON instructed clients to exaggerate their limitations to increase the hours that could be billed to Medicaid.

An example of this coaching occurred on September 12, 2022 at approximately 9:28 a.m. HENTON received a call from a female client whom he and DANIELS called

"Denise." During the intercepted call, Denise stated, "Hey, I have a question: The nurse was just here the other day for the evaluation, and now the other one is coming in because she wants me to... Well, she's doing all my check-ins now, but she wants me to tell her what... whoever comes over, you know, to the house... what they do for me every day. I don't know what to say because I don't know how many hours you supposed to be here." HENTON then asked, "Who wants to know that?" Denise responded, "IRIS."[1] HENTON asked whether it was "for [her] consultant," and Denise acknowledged it was. DANIELS got on HENTON's line and stated, "Okay, so, um, you have Delores... You tell her that A Touch of Love does services. You have multiple people who come, and two of the people is Delores Giller and Joelle MASSEY. Two of the workers that work for A Touch of Love is Joelle and Delores... and Joelle MASSEY, right? And your daily activity consists of—One is arranging your clothes..." DANIELS continued, "Helping you pick out and sort your clothes. Two is helping you plan out your day. . . Three is store runs; they make store runs for you. . . Number four, number four is—is meal prep… Uh... uh... Number five is to help you to sort out all your bills so you can make bill payments. . . And then they also do take care of your medical and doctor runs, picking up your medications." Denise then asked, "And this is what IRIS will be doing for me?" DANIELS stated, "No, this is what A Touch of Love—this is what A Touch of Love…" HENTON interjected, "IRIS don't do anything; they just come out." HENTON added that IRIS is "supposed to report the case, what A Touch of Love do with the services they give, the services that happen with you every day."

As the call continued, DANIELS stated, "Right, I just told you, you gotta write that down. Write that down; say, 'They take care of my baths.' That's another one; write down—say, 'Bathroom. They help me get in and out of the shower,' right? 'They help me get in and out of the shower as well.' You know what I'm saying? "I can't get up and move around; they help me with these needs.'" HENTON added, "You gotta always say that we—'cause you got very low hours." Denise replied, "And that's why they doing this, because they were only were giving you whatever, seven hour a week, and I told her I needed 15, so then I can get you the damn money. But I gotta tell her... she needs to know exactly what they are doing every day, so it's going to be more than pick up my clothes. She's gonna have to help me get in the shower, then help me get all dress, you know, that kind of. . . ."

Later in the call, DANIELS stated, "And here's the thing, too, Denise. Let me share this with you. Are you listening to me? I'm gonna share this with you, right? You can't— Remember, me and you talk about this before. With these services you can't—you have

---

1 The IRIS program (**I**nclude, **R**espect, **I** Self-Direct) is a Medicaid Home and Community-Based Services (HCBS) waiver program authorized under § 1915(c) of the Social Security Act and approved by the Centers for Medicare and Medicaid Services (CMS). IRIS is a self-directed program for adults with disabilities and elderly people in Wisconsin. To be eligible for the IRIS program, one must be eligible for Medicaid, need the same level of care as someone in a nursing home, and live in a home, apartment, adult family home, or residential care apartment complex.

13

to let your pride go." Denise replied, "I know. And I did when the nurse was here." DANIELS continued, "But if the nurse asks, you say, 'Listen, I have a cognitive—I am cognitively delayed, and I [don't] know how to count and read and write. I need someone to help me with my bills and to read my mail and different things like that.' Say, 'I'm part of the older generation who didn't know how read and write.' Now, when you give them things like that, they also gives them the ability to write that down and say, 'Well, hey, we never had this; have you talked to your doctors?' 'Yeah, my memory is not good.' 'Have you had a memory test?' Like, 'No.' So now they schedule you for these things, and these are just simple things that are very easy for us to pass. You follow me? . . . They ask you five or six questions, da-da-da-da. You answer some of them wrong; you got bad memory. Uh... the doctor overlooks it. 'She says she don't know how to read.' He won't even ask you to read nothing; he just really writes it down and says that you are cognitively delayed concerning your reading and your ability and things like that. Those give you hours; they give you—that tells them that the people who are servicing you have—they have to do more for you. Plus, the State requires that anybody who has not—who's cognitively delayed, cannot read, cannot write—are people who are qualified for SSI, qualified for more assistance. So these are—this is just something some of the things we have been able to use over the [U/I]."

Denise replied, "They are never going to—I mean, I have a college education. So, I mean, they are never going to look into this, right?" DANIELS stated, "No, they are not going to look." Denise responded, "Okay, 'cause clearly I am bullshitting." DANIELS acknowledged, and HENTON stated, "They are plenty of people that have a college education that [U/I]." Denise asked, "When they are on their forties and fifties?" HENTON replied, "Yeah," and Denise then stated, "Well, I guess I can be one of them."

During this same call, DANIELS told Denise that "all [the doctors] care about is this: If you tell your doctor something and he puts it in his notes, that's all they care about." DANIELS then stated, "That's why when I go to the doctor with people. I'll go in and list some of the major things that I, I list. But I haven't been able to do that with you, per se, so that we can do it with your doctor, because you was at the, that clinic, and we wasn't able to get there. You got a real doctor. Once you have a real doctor, you did the... Like, I can take you back in there, and I can say, 'Hey, how are you doing? This is my mother-in-law. She is going through this, this, and that. These are some thing that she has never reported.' And then, once you put all that on there, now they will begin to look at your medical. So that's what they was just telling the--over at the other company. They just like, 'Denise having Medicaid. She has very few illnesses. She just has illnesses. She wants disability.' And, like, boom, boom. And I just like, 'Well, there's still proof of the services, because you gotten the services before so...' A lot of companies worry, but your doctor has... a medical condition that allows you to have services. But at the same time, people like IRIS and them, they are not looking in depth. That's why they gave you most services, 'cause they don't really see a big, big medical file; no long medications and all those things like that, 'cause you don't take them. So that's why with me, before I was

14

telling you, it would have been really good for me and you to had you a regular doctor. We could have you some medications, even though you never took 'em; they just sat in there. They prescribe them to you, sell them to you, and you leave then on the shelf, you know? Different creams, different pills and things like that, so that whenever we want to tell them and say, 'Oh, well, the medication is giving her side effects; this is happening,' they give you hours for that because the [U/I].'" Denise replied, "Okay, well, she's gonna be here in a few minutes, so I'm gonna go [U/I] and get my walker [U/I], okay?"

In addition to the fraud committed through FRSC and ATOL, DANIELS, HENTON, and MASSEY conspired with codefendant Lenard MONROE to sign their clients up for services that were never rendered through Wellness Personal Care Services (WPCS), a personal cares agency run by MONROE. In exchange for client referrals, MONROE paid DANIELS and HENTON bi-weekly kickbacks. Between September 2020 and December 2021, WPSC (Monroe) paid FRSC approximately $782,000 for DANIELS' and HENTON's kickback payments. The memo line of almost every check written to FRSC from WPSC indicated that it was for "payroll" or "consultant," however records from the State of Wisconsin show that no wages were actually paid to DANIELS, HENTON, or FRSC.

Text messages and interviews with alleged personal/supportive cares workers (PCWs) for these agencies establish that MONROE, MASSEY, DANIELS, and HENTON worked together to create false timesheets, personally or by directing others to do so. MASSEY's cell phone was also searched pursuant to a federal search warrant, and text messages therein reflect that the co-conspirators filled out timesheets submitted to Medicaid for billing according to templates or prefilled sheets, rather than actual work performed. The co-conspirators typically filled a stack of timesheets all at once, checking the same boxes for the types of work performed, the days and hours worked, and PCW mileage, without regard for any actual work performed. These sheets were all filled out identically, to match a "sample" timesheet supplied by DANIELS or MONROE. Client names, PCW names, and dates were filled in later.

When search warrants were executed at the business premises for WPCS, ATOL, and FRSC on November 29, 2022, investigators located a number of WPCS timesheets. Each timesheet generally contained identical information regarding services performed, despite the clients' different conditions and needs. For example, almost every client allegedly received a "sponge bath bathroom" every day but Wednesday, when they purportedly received a "shower."

When law enforcement interviewed 16 of the clients whose information ATOL and WPSC used to bill Medicaid, none reported ever needing, requesting, or receiving a sponge bath. These clients generally denied receiving any of the claimed services, aside from a few instances of assistance with transportation to an appointment or laundry. They also largely denied signing the timesheets. Moreover, each of the recovered

timesheets reflected the same number of hours worked and total miles traveled, even when different PCWs were allegedly performing the services. Law enforcement also confirmed that many of the PCW signatures on the timesheets had been forged.

For example, U.A. told case agents that U.A. met DANIELS and HENTON and after responding to an advertisement for housing assistance in a "blue book" magazine. According to U.A., the advertisement offered assistance for those on Medicaid. U.A. suffers from diabetes, seizures, high blood pressure, and broken vertebrae in their back. According to U.A., MASSEY brought a nurse over to U.A.'s apartment for an initial assessment. U.A. stated, "WPCS and ATOL haven't done anything for me." U.A. never signed any care worker time sheets (which are required to be completed by the personal or supportive care worker and signed by the client). Therefore, any signature on timesheets for U.A. from these businesses that were submitted to Medicaid would contain a forged signature and falsified information alleging services rendered. According to Medicaid records from the State of Wisconsin, since January of 2020, ATOL and WPCS both billed for services allegedly rendered to U.A. and received payments of approximately $24,580 and $44,700, respectively, from the State of Wisconsin Medicaid for those purported services. Specifically, on June 10, 2021, ATOL billed and received from Wisconsin Medicaid $80 for services for U.A. purportedly performed on May 23, 2021, when in fact these services were never rendered.

Based on Medicaid billing records, ATOL, FRSC, and WPCS received money for services never performed for the 16 individuals interviewed, and for the individual identified above as "Denise." The total amount of U.S. currency ATOL and FRSC received for these individuals was $568,989.00. The total amount of U.S. currency WPCS received for the same individuals was $1,133,758.36.

### MONEY LAUNDERING

The DTO used ATOL, FRSC, and other bank accounts to funnel and disguise the source of drug proceeds. Case agents subpoenaed and examined bank records for the period between January 2018 and May 2022 for DANIELS, B. DANIELS, HENTON and their supportive cares agencies. While these accounts were set up as business bank accounts and collectively received well over $1,500,000 in Medicaid payments, records for these accounts reflected minimal legitimate business expenses and no payroll services during that period.

Instead, the accounts all showed patterns of unexplained cash deposits and large cash withdrawals uncharacteristic of a legitimate healthcare business. These accounts also were drawn upon to transfer money to known DTO suppliers. During the period described above, the accounts collectively received approximately two million dollars in unexplained cash, while withdrawals totaled over $2,700,000.

For example, from January 2021 to May 2022, a BMO Harris bank account ending in x4242 in the name of First Response Supportive Care received approximately $171,000 from Wisconsin Medicaid and approximately $70,000 in cash deposits. This account had $241,000 in cash withdrawals during the same period. On October 21, 2021, $50,000 in funds from the BMO account ending in x4242 were used to obtain a cashier's check made out to DTO supplier Joathan COLULA. This check was deposited into a bank account in the name "COLULA's Bail Bonds." The memo line on the check stated, "For Services Rendered." The remitter was listed as "First Response Sup."

Additionally, on October 17, 2022, DANIELS called B. DANIELS on an intercepted line. During the call, DANIELS went to a bank branch and could be heard asking for a cashier's check in the amount of $10,361 to be made out to "Tier One Records," an account held by DTO middleman Deonte EDWARDS.

DANIELS, HENTON, and B. DANIELS' used a previous FRSC bank account in a similar way. On August 11, 2015, B. DANIELS opened an account ending in x7680 at Chase Bank. On October 21, 2015, DANIELS was added as a signer on the account. Bank records for January 2018 to December 2020 reflect that the account received approximately $194,000 from Wisconsin Medicaid and approximately $1,186,768 in cash deposits. Cash deposits did not begin until January 2020, and during the subsequent twelve-month period, over $1,000,000 in unexplained cash was deposited into the account. One of these cash deposits, in the amount of $75,000, was made by HENTON on July 2, 2020. From January 2018 to December 2020, approximately $1,677,633 in cash was withdrawn from this account. DANIELS withdrew over $1,000,000 in cash from this account in 2020 while he was in California, where the DTO was known to source narcotics. Like the BMO accounts, the Chase account did not have any traditional payroll activities or outgoing checks to nurses, clients, or other healthcare related expenses. Cash deposits accounted for 70% of all the credits into the account and cash withdrawals accounted for 77% of the debits.

HENTON and DANIELS also used ATOL's bank accounts in similar ways. On or about January 1, 2018, HENTON opened Educator Credit Union (ECU) bank accounts ending in x413_08 (ECU 1) and x413_00 (ECU 2). Both accounts were opened in the name of A Touch of Love (ATOL). HENTON was the sole signer for this account until March 18, 2021, when DANIELS was added as an additional signer. In approximately December 2021, HENTON changed the name on this account from ATOL to "The Perfect Choice Supportive Home Care."

From approximately January 1, 2018, to May 18, 2022, ECU 1 received approximately $1,400,000 in Medicaid payments from the State of Wisconsin, consisting of approximately 600 separate payments in the form of ACH deposits. During the same timeframe, HENTON and DANIELS withdrew approximately $1,064,000 in cash from ECU 1. Account records reflect that whenever Medicaid made deposits, those deposits

were withdrawn almost in their entirety in cash the same day. Additionally, ECU 1 received approximately 213 cash deposits totaling approximately $441,000. There were several times when these deposits were in excess of $10,000 or were $10,000 exactly. These deposits were DTO proceeds.

During the same time frame mentioned above, approximately $150,000 was transferred from ECU 1 to ECU 2. Further, ECU 2 received approximately $140,000 in cash deposits during this same time frame. These deposits were also DTO proceeds.

Further analysis showed that despite ECU 1 purporting to be a business account for ATOL, bank records do not reflect the payment of common business expenses including payroll, payments to nurses, clients, or other healthcare expenses from this account. Additionally, according to the Wisconsin Department of Workforce Development, ATOL did not report any wages. According to records obtained pursuant to an *ex parte* tax order, neither HENTON nor ATOL filed tax returns for 2019, 2020, or 2021.

Furthermore, HENTON and DANIELS opened bank accounts ending in x1789 and x3484 at Associated Bank under the name "Intelligent Investments." These two accounts were opened in January and February 2019 and were closed in August and September 2020, respectively. The account ending in x1789 received a total of $135,749.59 in cash deposits (accounting for 67% of incoming funds), and the account ending in x3484 received approximately $95,892.01 in cash deposits (accounting for 86% of incoming funds).

On October 16, 2020, DANIELS and HENTON opened Chase Bank account ending in x2062 in the name of "Intelligent Investments." Between approximately December 2020 and December 2021, the account ending in x2062 received approximately $99,000 in cash deposits. During this time, approximately $35,000 in payments to American Airlines were made, $30,000 in cash withdrawals were made, and approximately $17,000 in payments to hotels were paid from this account.

On March 31, 2022, DANIELS and HENTON opened another Chase Bank account ending in x8205 in the name of "Intelligent Investments." The signature card lists HENTON listed as the "President" and DANIELS as "Acting Secretary." In October 2022, DANIELS made at least three cash deposits totaling approximately $94,000 into this account.

Financial analysis of the Intelligent Investments bank accounts reflects that they did not operate as any type of legitimate business. Instead, these accounts were used to disguise the nature and origin of DTO proceeds. For example, in addition to the activities described above, at least three checks from Intelligent Investments, in the amounts of $15,000 (August 19, 2022), $17,750 (August 27, 2022), and $17,750 (September 8, 2022),

18

were made out to DTO middleman EDWARDS and deposited into his Chase Bank account under the name "Tier One Records."

## CONCLUSION

HENTON now admits that he is responsible for the distribution of at least 1.3 kilograms of fentanyl, 5 kilograms of cocaine, 450 grams of methamphetamine, 25 grams of heroin, and 15 pounds of marijuana, because these amounts were reasonably foreseeable to him. HENTON further admits that he possessed the firearms found in his home on November 29, 2022, in furtherance of his drug trafficking activities. HENTON also admits that he was involved in the use of various business bank accounts to conceal and disguise the nature of source of the DTO's drug proceeds.

Furthermore, HENTON admits that there was a scheme to defraud Wisconsin Medicaid (a health care benefit program), that he knowingly and willfully carried out the scheme and acted with the intent to defraud Wisconsin Medicaid, and that the submission for payment for services for U.A. involved a materially false representation and was submitted to induce payment for services not rendered.